165 N.J. Super. 443 (1979)
398 A.2d 587
RIGHT TO CHOOSE: E.M., P.B., A.C., D.T., E.R. ON BEHALF OF E., A MINOR, AND D.C. ON BEHALF OF K., A MINOR, ALL ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED; EDWARD S. MILNER, JR., M.D.,; NEW JERSEY WELFARE RIGHTS ORGANIZATION; AND NEW JERSEY RELIGIOUS COALITION FOR ABORTION RIGHTS, PLAINTIFFS,
v.
BRENDAN T. BYRNE, GOVERNOR, STATE OF NEW JERSEY; JOHN J. DEGNAN, ATTORNEY GENERAL, STATE OF NEW JERSEY; ANN KLEIN, COMMISSIONER, DEPARTMENT OF HUMAN SERVICES, STATE OF NEW JERSEY; G. THOMAS RITI, DIRECTOR, DIVISION OF HUMAN SERVICES, STATE OF NEW JERSEY; THOMAS M. RUSSO, ACTING DIRECTOR, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, DEPARTMENT OF HUMAN SERVICES, STATE OF NEW JERSEY; AND JOANNE E. FINLEY, COMMISSIONER, DEPARTMENT OF HEALTH, STATE OF NEW JERSEY, DEFENDANTS, AND JOHN T. SCULLY, M.D., F.A.C.S., AS GUARDIAN ON BEHALF OF THOSE CONCEIVED BUT UNBORN HEREIN AND ON BEHALF OF OTHERS SIMILARLY SITUATED; DOMINIC A. INTROCASO, M.D., F.A.C.O.G.; ANTHONY P. DESPIRITO, M.D., F.A.A.P.; THE NEW JERSEY RIGHT TO LIFE COMMITTEE; THE STUDENT AD HOC COMMITTEE AGAINST THE WAR IN VIETNAM AND NEW JERSEY CONCERNED TAXPAYERS, AN ASSOCIATION, INTERVENORS.
Superior Court of New Jersey, Chancery Division.
Decided January 10, 1979.
*447 Ms. Nadine Taub, Ms. Joan Vermuelen, Mr. Edward Tetelman and Mr. Louis Raveson for plaintiffs.
Mr. Michael R. Cole, Assistant Attorney General, and Ms. Andrea M. Silkowitz, Deputy Attorney General, for defendants (Mr. John J. Degnan, Attorney General of New Jersey, attorneys).
Mr. Stephen J. Foley for intervenors.
*448 FURMAN, J.S.C.
Plaintiffs challenge N.J.S.A. 30:4D-6.1, which prohibits a state contribution to Medicaid funding for an abortion unless the abortion is necessary to preserve the pregnant woman's life. Based upon five days' trial testimony, affidavits and legal argument plaintiffs contend that the statute under challenge is in dereliction of New Jersey's obligation under the Federal Medicaid Act, 42 U.S.C.A. § 1396 et seq., and infringes the Due Process, Equal Protection and Establishment of Religion Clauses of the Federal and State Constitutions and the Freedom of Religion Clause of the Federal Constitution.
Plaintiffs are four women who were pregnant when their complaint or amended complaint was filed, two mothers on behalf of minor daughters who were then pregnant, a medical doctor, two nonprofit associations formed to protect abortion and welfare rights, and a religious association for abortion rights.
In accordance with R.R. 4:32-1, 2, this court certified the individual plaintiffs as representatives of two classes: Medicaid-eligible women who are seeking funding for elective nontherapeutic abortions and for abortions which are medically necessary for the protection of their health, although their pregnancies are not life-threatening. Injunctions (R.R. 4:52-2) to order Medicaid funding for abortions for two of the individual plaintiffs and both minors were granted, based upon proof by affidavits of medical opinions that carrying their fetuses to term would threaten severe and long-lasting impairment of their health. The classes which plaintiffs represent are capable of repetition, and without their certification as representatives class action adjudication would be evaded. Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972), reh. den. 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973).
Defendants are state officials with responsibility for the administration of the State Medicaid statute. Defendant intervenors are three medical doctors, a nonprofit corporation *449 formed to oppose abortion, a nonprofit association of students opposing the war in Vietnam and a nonprofit taxpayers association.
N.J.S.A. 30:4D-6.1 was enacted as L. 1975, c. 261, effective December 18, 1975. Prior to that New Jersey imposed no statutory restriction on Medicaid funding for abortions. Judge Barlow in the Federal District Court for New Jersey enjoined the enforcement of N.J.S.A. 30:4D-6.1 in Doe v. Klein, No. 76-74 (injunction issued March 18, 1976). He vacated that injunction in August 1977, subsequent to the United States Supreme Court decisions in Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), and Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), which uphold the federal statutory and constitutional validity of Pennsylvania and Connecticut statutes prohibiting Medicaid funding for elective nontherapeutic abortions. The Court of Appeals for the Third Circuit affirmed the dissolution of the injunction. Doe v. Klein, 568 F.2d 768 (1978).
In Beal Justice Powell commented:
* * * Although serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund unnecessary  though perhaps desirable  medical services. [432 U.S. at 444, 445, 97 S.Ct. at 2371]
Planned Parenthood of New York City v. State, 75 N.J. 49 (1977), barred reimbursement to Planned Parenthood for elective abortions performed in New York on New Jersey residents prior to the Supreme Court decisions striking down criminal abortion statutes as an invasion of the constitutionally protected right to privacy (Wade, supra; Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1972), reh. den. 410 U.S. 959, 93 S.Ct. 1410, 35 L.Ed.2d 694 (1973)). In his concurring opinion, paralleling Justice Powell's comment, Justice Pashman noted that the court's decision should in no way be construed

*450 * * * as a judicial sanctioning of the validity of N.J.S.A. 30:4D-6.1, L. 1975, c. 261, § 1, effective December 18, 1975, which prohibits payments for termination of a woman's pregnancy for any reason except where it is medically necessary to save her life. This is a question for another day. Neither should the recent decision of the United States Supreme Court in Maher v. Roe [citation omitted] be considered as dispositive of the equal protection issue under the New Jersey Constitution.
* * * * * * * *
The effect of the challenged regulation would be to ban Medicaid abortions for the poor. I have serious doubts as to the constitutionality of such a prohibition. It may well violate the equal protection guarantees inherent in Art. I, par. 1 of the New Jersey Constitution by making an irrational distinction between groups of pregnant women. [75 N.J. at 56, 71]
The issue framed by Justice Powell in Beal and by Justice Pashman in Planned Parenthood is before this court for resolution.
Medicaid is a joint federal-state system for funding medical services for families with dependent children and aged, blind or disabled individuals without financial resources to pay for them. It was enacted as 79 Stat. 343; 42 U.S.C.A. § 1396 et seq., on July 30, 1965. Participation by states is optional, not compulsory. A participating state's Medicaid plan must be approved by the Federal Department of Health, Education and Welfare. New Jersey's plan was approved in 1970 and has not been amended to include the restrictions against Medicaid funding for abortions in N.J.S.A. 30:4D-6.1. According to Aitchison v. Berger, 404 F. Supp. 1137 (S.D.N.Y. 1975), aff'd 538 F.2d 307 (2 Cir.1976), cert. den. 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), H.E.W. approval is not dispositive of a state plan's compliance with the federal Medicaid Act.
No federal Medicaid payments are available except to a participating state. Such payments are advances for the next quarter-year, in accordance with a mathematical formula reflecting state Medicaid disbursements during the preceding quarter-year. Both federal and state legislative appropriations finance Medicaid.
*451 The Federal Congress, like the New Jersey Legislature, has enacted limitations on Medicaid funding for abortions. The so-called Hyde Amendment, P.L. 95-205, 91 Stat. 1460, approved December 9, 1977, provides as follows:
* * * [N]one of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.
Plaintiffs are not attacking the constitutional validity of the Hyde Amendment. Their argument is that the Hyde Amendment is not binding on the states and is not an implied repealer of the statutory obligation of the states under 42 U.S.C.A. § 1396 et seq., as plaintiffs construe that act, to provide Medicaid funding for medically necessary abortions. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (holding that an appropriations act without express language of repealer did not repeal by implication prior conflicting legislation).
The Hyde Amendment by its terms is a limitation on federal, not state, Medicaid appropriations. Nevertheless it may be viewed as binding on the states in the sense that it defines "necessary medical services" in the particular instance of abortions and is, accordingly, a clarification, not an implied repealer, of the general terms of 42 U.S.C.A. § 1396 et seq., excluding from the definition of "necessary medical services" abortions which are medically recommended to prevent an insignificant or temporary impairment to a pregnant woman's health, not a severe and long-lasting impairment.
The effect of the Hyde Amendment need not be resolved. N.J.S.A. 30:4D-6.1 is more restrictive than 42 U.S.C.A. § 1396 et seq., as plaintiffs construe that act, or than *452 the Hyde Amendment. In limiting Medicaid funding for abortions to life-threatening circumstances, N.J.S.A. 30:4D-6.1, according to plaintiffs, is in violation of the federal Medicaid Act and the Hyde Amendment, if either or both impose an obligation on this State as a participating state to provide Medicaid funding for all medically necessary abortions.
The crux of plaintiffs' statutory argument is the statement of purpose in 42 U.S.C.A. § 1396:
* * * [to enable] each State * * * to furnish medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services * * *."
The standard of "necessary medical services" is repeated in 42 U.S.C.A. § 1396a(a) (10) (C) (i) and in H.E.W. regulations implementing the act (42 C.F.R. § 449.10(a) (5) (i)).
In general, standards of participating states for benefit eligibility must not be more restrictive than the standards in Title 42. Philbrook v. Glodgett, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); White v. Beal, 555 F.2d 1146 (3 Cir.1977) (state's funding of Medicaid benefits based solely on the cause of the disability rather than medical necessity held to conflict with Social Security Act); Rush v. Parham, 440 F. Supp. 383 (N.D. Ga. 1977) (state plan that denied Medicaid coverage for transsexual surgery held contrary to federal mandate to provide funding for necessary medical services).
In the particular context of Medicaid funding for abortions a federal Court of Appeals in a published opinion and four federal District Courts in unpublished opinions have held that the obligation of participating states under 42 U.S.C.A. § 1396 et seq. is to provide Medicaid funding for all necessary medical services, including abortions to protect *453 a pregnant woman's health. Their rationale is that the meaning of "necessary medical services" does not differ when the condition treated is pregnancy; that medical necessity cannot be limited to services to save a life in peril, and that state statutes and regulations paralleled to N.J.S.A. 30:4D-6.1 are therefore invalid on statutory grounds.[1]Doe v. Kenley, 584 F.2d 1362 (4 Cir.1978); Roe v. Casey, 464 F. Supp. 487 (E.D. Pa., 1978); Emma G. v. Edwards, 434 F. Supp. 1048 (E.D. La., 1978); Zbaraz v. Quern, No. 77C 4522 (N.D. Ill., decided May 15, 1978); Smith v. Ginsberg, No. 75-0380 CH (S.D.W. Va., decided May 9, 1978).
In addition, in Jaffe v. Sharp, 463 F. Supp. 222 (D. Mass., decided July 28, 1978) the federal District Court of Massachusetts granted a preliminary injunction against enforcement of a Massachusetts statute limiting Medicaid funding for abortions to life-threatening circumstances or to victims of rape or incest.
A contrary result was reached in D---- R---- v. Mitchell, 456 F. Supp. 609 (D. Utah, 1978). That opinion does not question that 42 U.S.C.A. § 1396 et seq. requires Medicaid funding for necessary medical services. Rather it holds that, since Title XIX was enacted in 1965, its definition of medical necessity should be limited to abortions lawful and not criminally proscribed in "most states" prior to the United States Supreme Court decisions in Wade and Bolton. In New Jersey, as in a majority of states, abortions were lawful prior to Wade and Bolton only where the pregnant woman's life was endangered. N.J.S.A. 2A:87-1, L. 1849, p. 266, as amended; State v. Brandenburg, 137 N.J.L. 124 (Sup. Ct. 1948); State v. Shapiro, 89 N.J.L. 319 (E. & A. 1916).
*454 The conclusion in D---- R---- v. Mitchell attaches validity to statutes where were ruled unconstitutional only eight years after the enactment of the Medicaid Act.
This court construes "necessary medical services" in 42 U.S.C.A. § 1396 as applicable to abortions even though health, not life, is endangered, consistently with Kenley, Casey, Edwards, Jaffe, Zbaraz and Smith. N.J.S.A. 30:4D-6.1 is in conflict with the governing federal enactment, whether the Hyde Amendment is binding on the states or not, and must therefore be held invalid as a breach of this State's obligation as a participating state to provide its share of Medicaid funding for necessary medical services, including abortions.
Notwithstanding the foregoing holding of the invalidity of N.J.S.A. 30:4D-6.1 on statutory grounds, this court should reach findings and conclusions on the due process, equal protection, free exercise of religion and establishment of religion challenges, in view of the extensive trial testimony on these constitutional issues.
United States Supreme Court decisions are controlling on several federal constitutional issues which are raised in this litigation. Wade recognizes a pregnant woman's right of privacy to decide whether to terminate her pregnancy, in invalidating a state criminal abortion statute, which excepted only abortions to preserve the life of a pregnant woman, as a violation of the Due Process Clause of the Fourteenth Amendment. The opinion counterposes two conflicting state interests: protection of the health of the pregnant woman and protection of the potentiality of human life. In the final trimester of pregnancy during viability of the fetus, according to dictum in Wade, a state may proscribe abortion as a crime "except when it is necessary to preserve the life or health of the mother." 410 U.S. at 163, 164, 93 S.Ct. at 732.
Maher rejects an equal protection attack on a state statute denying Medicaid funding for elective nontherapeutic abortions. Plaintiffs argued that the class of indigent women they represented were unconstitutionally discriminated *455 against because without Medicaid funding they were effectively deprived of their constitutionally protected right of privacy to decide whether to terminate their pregnancies. Justice Powell's majority opinion holds that withholding of medicaid funding does not impinge on the indigent women's right to an abortion because they had no prior right to public funding for elective nontherapeutic abortions; that indigent women seeking abortions are not a "suspect" class under the two-tier equal protection test; that the equal protection test is not that of a compelling state interest but rather that of a reasonable relationship to a constitutionally permissible purpose, and finally, that the important and legitimate interest of the state in protecting the potentiality of human life and in encouraging normal childbirth is a constitutionally permissible purpose.
Bolton and United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971), consider and reject challenges to the vagueness and indefiniteness of state criminal abortion statutes under the Due Process Clause of the Fourteenth Amendment. The terms of N.J.S.A. 30:4D-6.1 limit Medicaid funding to abortions which are "medically indicated to be necessary to preserve the woman's life." That standard is parallel to the standards sustained as sufficiently definite in Bolton ("based upon [the physician's] best clinical judgment [that] an abortion is necessary") and in Vuitch ("unless the same were done as necessary for the preservation of the mother's life or health"). Medical certainty of death is an unworkable standard. N.J.S.A. 30:4D-6.1 should be construed to authorize Medicaid funding for abortions when in the best medical judgment of her doctor exercised in good faith there is a substantial danger to a pregnant woman's life if an abortion is not performed.
In summary, it is determined that plaintiffs in this litigation are foreclosed by the foregoing United States Supreme Court decisions from arguing as a matter of federal constitutional law that the withholding of Medicaid funding for elective nontherapeutic abortions is a denial of equal protection *456 of the law or that N.J.S.A. 30:4D-6.1 lacks a reasonable relationship to a constitutionally permissible purpose or is vague and indefinite in violation of due process of law.
On these issues there is no variance discernible in New Jersey decisional law to warrant a contrary result. See Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249 (1976), app. dis. 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977); Puchalski v. N.J. State Parole Board, 104 N.J. Super. 294 (App. Div. 1969), aff'd 55 N.J. 113 (1969); Laba v. Newark Bd. of Ed., 23 N.J. 364 (1957).
The remaining equal protection issue is one never adjudicated in abortion litigation. According to plaintiffs' argument, the class discriminated against is Medicaid eligible women whose doctors recommend an abortion as medically necessary for the protection of their health. Unlike all other Medicaid eligible persons with a medical necessity for some treatment or procedure, Medicaid eligible women with a medical necessity for an abortion (as defined in the Hyde Amendment or otherwise) are denied Medicaid benefits and thus effectively denied the abortion because they lack financial means to pay for it.
Maher is distinguishable in its conclusion that there had never been a right to Medicaid funding for elective nontherapeutic abortions, and thus the rational, not compelling, interest test applies in determining the constitutionality of a state prohibition of such Medicaid funding. In New Jersey Medicaid funding for abortions which were medically necessary but not involving danger to life was available from the Wade and Bolton decisions until the lifting of the injunction in Doe v. Klein in August 1977.
Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), is relevant. The court there held that procedural due process under the Fourteenth Amendment entitles a welfare recipient to an evidentiary hearing prior to termination of benefits, on the ground that welfare benefits "are a matter of statutory entitlement for persons qualified to receive them * * *. Their termination involves state *457 action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are a `privilege' and not a `right.'" 397 U.S. at 262, 90 S.Ct. at 1017.
The consequences of N.J.S.A. 30:4D-6.1 have been drastic statistically. Between the lifting of the injunction and the revised order of the State Department of Health pursuant to a preliminary ruling of this court, births to Medicaid eligible women increased by 30% and the number of Medicaid-funded abortions dropped from an average of over 900 a month to an average of under 25 a month. The incontrovertible effect of the statute under attack has been to block Medicaid eligible women from medically necessary abortions.
The right of privacy to decide whether to terminate a pregnancy is parallel to the right to a woman's bodily integrity identified in Chief Justice Weintraub's dissenting opinion in Gleitman v. Cosgrove, 49 N.J. 22, 59 (1967).
The right to protect one's health may also be encompassed within the fundamental liberties protected by the Fourteenth Amendment, as well as by Article I, paragraph 1 of the State Constitution: "All persons * * * have certain natural and inalienable rights, among which are those * * * of pursuing and obtaining safety and happiness."
A right to protect one's health should extend to a right to the benefit of public funding available for that purpose, without unreasonable discrimination.
In Memorial Hospital v. Maricopa Cty., 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the United States Supreme Court held that "medical care is as much a `basic necessity of life' to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements." 415 U.S. at 259, 94 S.Ct. at 1082.
After Medicaid funding for medically necessary abortions for the protection of pregnant women's health was *458 made available, its withholding should not be discriminatory, barring funding for abortions but not for other medically necessary treatments and procedures, except on the basis of a compelling state interest under federal constitutional law.
In view of the determination of this litigation on statutory grounds, the equal protection issue is mooted but not decided whether the state's interest in protecting the potentiality of human life in the fetus justifies the denial of Medicaid funding for medically necessary abortions and thus effectively the denial of abortions to Medicaid eligible women except in life-threatening circumstances.
The trial testimony was focused on the establishment of religion and free exercise of religion issues. Plaintiffs attempted to prove that N.J.S.A. 30:4D-6.1 is necessarily rooted in religious beliefs and has no other rationale; that the Roman Catholic Church intervened in the legislative process with undue pressure for the enactment of N.J.S.A. 30:4D-6.1, and that the statutory limitation on Medicaid funding for abortions conflicts with the religious obligation of some Protestants and Jews and thus inhibits their free exercise of religion. These constitutional issues were not raised in Beal or Maher.
From the conflicting testimony it is concluded that life begins at conception in the sense that a new living embryo is created; that whether this life is to be designated "human life" is not a biological question but a theological or philosophical question; that the Roman Catholic Church and some other religions accept as dogma that human life begins at conception, and that other widely held views, both religious and secular, are that human life begins at quickening,[2] at viability or at birth.
Plaintiffs urge that the only legislative purpose which may be hypothesized for N.J.S.A. 30:4D-6.1 is to adopt *459 and further a religious belief by impeding abortions as the equivalent of infanticides, unless the pregnant woman's life is in danger.
The argument is untenable. Prior to Wade and Bolton this State proscribed abortion as a crime except when medically necessary to save the pregnant woman's life. Presumptively the enactment of that criminal statute in 1849 and its enforcement without repeal or amendment until 1973 must have been based upon a widespread public view of the moral wrongfulness of abortion, apart from its interdiction by some religions. Neither religious nor moral opposition to abortion per se can support its criminal proscription throughout gestation. But this court cannot conclude that the legislative purpose in enacting the statute under attack was solely religious, excluding moral opposition.
Other rationales for N.J.S.A. 30:4D-6.1 include what may have been perceived as economic and demographic objectives, e.g., curtailing public spending for abortions and promoting population growth. Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), which struck down an Arkansas statute prohibiting the teaching of evolution in the public schools on the ground that it necessarily furthered a religious belief, is thus distinguishable.
The other establishment of religion issue is novel, that is, whether the Roman Catholic Church excessively entangled itself in the legislative process with undue pressure for the enactment of N.J.S.A. 30:4D-6.1.
Whatever the peril to a democratic society of predominant influence by one religion over the legislative process, such a constitutional attack has not been upheld in any cited federal or state decision. Active support of or opposition to legislation on gambling and alcoholic beverages by various organized religions has been commonplace. In Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the court noted:
Adherents of particular faiths and individual churches frequently take strong positions on public issues * * *. Of course, *460 churches as much as secular bodies and private citizens have that right. No perfect or absolute separation is really possible; the very existence of the Religion Clauses is an involvement of sorts  one that seeks to mark boundaries to avoid excessive entanglements. [397 U.S. at 670, 90 S.Ct. at 1412]
In McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), in sustaining the federal constitutional validity of a Sunday blue law the United States Supreme Court commented:
* * * the "Establishment Clause" does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demand such regulation. [366 U.S. at 442, 81 S.Ct. at 1113]
On this issue of undue religious interference with legislation plaintiffs' proofs fall short. Massive lobbying by Right to Life was testified to, including threats of opposition at the polls to opponents of N.J.S.A. 30:4D-6.1. But Right to Life was not linked to the Roman Catholic Church as its agent or arm with organizational or financial dependence on it. Nor was lobbying or other direct intrusion in the legislative process by the Church itself established. Most legislators who were members of the Roman Catholic Church voted for the legislative restriction on Medicaid funding for abortions, but some members of the Church voted against it. The trial record cannot support a finding of a violation of the Establishment of Religion Clause by the Roman Catholic Church in the enactment of N.J.S.A. 30:4D-6.1.
Clergymen of five Protestant denominations and a Reform Jewish rabbi were called as witnesses on the issue of denial of the free exercise of religion. Only one, a Presbyterian theologian, testified to a religious duty of a pregnant woman under some circumstances to submit to an abortion. The circumstances cited by him include one or several of the *461 following: serious danger to the health of the woman, her inability to care for an infant, abnormality of the fetus, psychological injury to the woman who was the victim of rape or incest, some other psychological or psychotic state which would lead to rejection of the infant when born, conception out of wedlock, mental incompetency, and impoverishment if the family already had several children.
The other clergymen and the rabbi testified generally that under circumstances such as the foregoing abortion might be recommended as the most moral option available in the context of Christian or Jewish faith. The abortion decision was posed in terms of moral conscience formed by the holy writings and teachings of their respective religions, but not in terms of religious duty.
The duty testified to by the Presbyterian is semantically different only from the moral option testified to by the other religions' representatives. All recognized the responsibility of the pregnant woman to adhere to her conscience, as that conscience is religiously enlightened. But none differentiated the abortion decision from other moral decisions confronting religious believers and others in their general conduct.
United States Supreme Court decisions on free exercise of religion deal with interference with a duty in the practice of a religion or with a duty arising from a basic tenet of the religion. The remedy is exemption of the plaintiff from the operation of the statute, not the invalidation of the statute. The test is parallel to the compelling interest test at the second tier of the two-tier test in equal protection challenges. According to Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)) "[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion * * *." 406 U.S. at 215, 92 S.Ct. at 1533.
In Yoder members of the Amish Church were held to be exempt upon completion of eighth grade from compulsory school attendance until age 16. The religious faith and mode *462 of life of the Amish were concluded to be "inseparable and interdependent." In the court's view the public interest in education of children for one or two additional years did not justify the undermining of the Amish religious practice and community.
Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), sustained the challenge of a Seventh Day Adventist to an unemployment compensation act which disqualified her for benefits because she refused employment on Saturday, thus in effect forcing her to abandon a tenet of her religion that Saturday is a day of worship and respite from worldly activities.
In Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 167, reh. den. 402 U.S. 934, 91 S.Ct. 1521, 28 L.Ed.2d 869 (1971), the United States Supreme Court suggests (at 462, 91 S.Ct. at 842) the limits of the First Amendment shield as follows: "The conscription laws * * * are not designed to interfere with any religious ritual or practice, and do not work a penalty against any theological position."
Unlike the Amish, the various Protestant denominations whose representatives testified have few or no religious dogmas and strictures. Freedom of conscience as religiously molded governs their members' actions and decisions. But to sustain a free exercise of religion challenge on the ground that members of these denominations are thwarted in the exercise of the most moral option in accordance with their consciences would be to enlarge the First Amendment to protect individual decisions that are not primarily religious, beyond the First Amendment's recognized intendment.
A pregnant woman's decision to terminate her pregnancy by abortion may be reached conscientiously in accordance with the general guidelines of her religion, but it cannot be defined as the fulfillment of a religious duty.
A further barrier to the free exercise of religion challenge should be dealt with. The issue is one of federal, not state, constitutional law. Under federal precedents only a *463 plaintiff who is an adherent of a religion has standing to raise the issue of infringement of its free exercise. Abington School Dist. v. Schempp, 374 U.S. 203, 222-223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); McGowan v. Maryland, supra.
No individual plaintiff is identified in the record as a member of any of the five Protestant denominations or of the Jewish sect whose free exercise of religion, according to plaintiffs, is derogated by N.J.S.A. 30:4D-6.1.
For the foregoing reasons this court rules against the establishment of religion and free exercise of religion challenges. N.J.S.A. 30:4D-6.1 is held to be invalid because its prohibition of Medicaid funding for abortions which are medically necessary for the protection of health is in conflict with this State's obligation as a participating State under governing federal law.
NOTES
[1] These decisions do not rely on the Supremacy Clause (U.S. Const., Art. VI).
[2] At common law abortion was not a crime until after quickening of the fetus. State v. Cooper, 22 N.J.L. 52 (Sup. Ct. 1849); Commonwealth v. Bangs, 9 Mass. 387 (Sup. Jud. Ct. 1812).